(C.D. 4335)

AMERICAN FOREIGN INDUSTRIES
JUDSON SHELDON INT'L CORP. } *v.* UNITED STATES

United States Customs Court, First Division

(Decided February 29, 1972)

*Glad & Tuttle* (*George R. Tuttle* and *Hudson F. Edwards* of counsel) for the plaintiffs.

*L. Patrick Gray, III*, Assistant Attorney General (*Gilbert Lee Sandler*, trial attorney), for the defendant.

Before WATSON, MALETZ, and RE, Judges

MALETZ, Judge: In these protests, plaintiffs challenge the government's duty assessment on certain hand-carved polyester articles that were invoiced as vases (emerald, lapis, sapphire, amethyst, etc.) and flying horses (jade green, lapis, amethyst, agate, etc.). The articles— which were imported from Hong Kong via San Francisco in 1962— were classified by the government under paragraph 233 of the Tariff Act of 1930, as modified, by similitude to "articles composed wholly or in chief value of agate, rock crystal, or other semiprecious stone" and assessed duty at the rate of 42½ percent.

Challenging this assessment, plaintiffs claim the articles are properly dutiable at the rate of 10 percent under paragraph 1558 of the 1930 act, as modified by T.D. 52739, as "[a]rticles manufactured, in whole or in part, not specially provided for." [1]

The relevant statutory provisions read as follows:

Classified under:

Paragraph 1559 of the Tariff Act of 1930, as amended by the Customs Simplification Act of 1954, 89 Treas. Dec. 242, T.D. 53599:

(a) Each and every imported article, not enumerated in this Act, which is similar in the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty as the enumerated article which it most resembles in the particular before mentioned; and if any nonenumerated article equally resembles in that particular two or more enumerated articles on which different rates of duty are

---

[1] At various stages in the litigation, plaintiffs made claims under paragraphs 214 (articles of earthy or mineral substances), 218(f) (articles of glass), and 1538 (manufactures of ivory). However, plaintiffs have produced no evidence to support these claims and have ignored them entirely in their brief. We therefore deem these claims abandoned.

chargeable, it shall be subject to the rate of duty applicable to that one of such two or more articles which it most resembles in respect of the materials of which it is composed.

Paragraph 233, Tariff Act of 1930, as modified by T.D. 54108:

All articles composed wholly or in chief value of agate, rock crystal, or other semiprecious stone, except such as are cut into shapes and forms fitting them expressly for use in the construction of jewelry, not specially provided for:

 *  *  *  *  *  *  *

 Other _____ 42½% ad val.

Claimed under:

Paragraph 1558, Tariff Act of 1930, as modified by T.D. 52739:

Articles manufactured, in whole or in part, not specially provided for * * *_____ 10% ad val.

The record is comprised of the testimony of two witnesses—one for plaintiffs and one for defendant—and four samples of the imported merchandise consisting of a green vase, a purple vase and two flying horses, one coral color and the other white.[2] The vases are about nine inches in height, are trumpet-shaped at the top and bottom, and contain at the center elaborate tree and flower carvings. The flying horses are approximately nine and one-half inches in height, with an overall length of eight and one-half inches, and are, in essence, statuettes of horses in a romanticized pose of excited motion.

Turning now to the testimony, plaintiffs' witness was, at the time of trial, vice-president of a company of international merchants which owned the plaintiff importing company and dealt in the export trade and occasionally in the import trade. The witness indicated that he was familiar with the products in issue since he was in charge of their importation from Hong Kong, and that in a cursory way he had observed their manufacture but had no intimate knowledge of their sales in the United States in view of the fact that he did not personally handle such sales. He testified that over the past 30 years, in Hong Kong and Singapore, he had seen articles made of semiprecious stone which were similar to the present importations but generally smaller in size; and that their value could range from $8,000 to $10,000, while even one of the poorest quality could not be purchased for less than $80.00.

---

[2] Plaintiffs have presented no evidence whatsoever regarding other protested items before this court, such as the "Monument," the "Tea Pot," the "Monk (slim)," the "Indonesian Belle," the "Sleeping Beauty," the "Smiling Buddha," etc. Therefore, we dismiss the protests with regard to all such items and consider only the protests covering the vases and flying horses.

Referring to the imported vases, the witness stated that when looked at from a distance they possessed a similarity to vases of semiprecious stone but that if one looked at them closely there was no similarity since the material of a semiprecious stone vase is imperfect in texture and hence would not have the same textural clarity and perfection as the imported vases, and also would weigh three times as much. The witness therefore concluded that upon close examination semiprecious stone vases were not similar to the imported vases and "it would have to be a very unsophisticated person that might be inclined to believe this was a semiprecious stone."

The witness stated that he has seen semiprecious stone vases "something like this [the imported vase] in a breakfront somewhere, maybe once or twice, and in various shops, quite rarely, as contrasted to the horse, which you see fairly frequently * * *" in good antique Chinese art shops throughout Asia. Such horses, he said, were occasionally made of semiprecious stone but more frequently of clay or ceramic. According to the witness, horses of semiprecious stone, similar to the imported horses, are not comparable in price, material and quality. Thus, he indicated he would be willing to pay between $80.00 and $120.00 for even a poor quality semiprecious stone horse but only $4.50 for the imported horse.

The witness testified that he would describe the imported green vase as emerald and would accept it as a jade though "[i]t's so phony, you could hardly tell what it is"; that he would describe the imported purple vase as amethyst; that one of the flying horses is coral in color but darker than ordinary rose quartz, though a fairly dark rose quartz is possible because of differing degrees of density; and that it was his inclination that the imported white horse more resembled an ivory horse than a semiprecious stone horse.

Concerning the uses for which purchasers bought the imported merchandise, the witness testified that he "imagine[d] they'd use them [the vases] as vases" or they "might" use them for decorative purposes. "It depends on how they like them." The only use for the horses, he added, is as decorative items.

Finally, the witness testified that he had not seen articles such as those involved here sold in a store where semiprecious articles are sold. In his view, the imported articles are "appealing for their own interest * * * rather than because of their resemblance to any other article."

Defendant's witness was, at the time of trial, a protest clerk in the Customs Bureau, whose hobby for the last three years has been collecting semiprecious stones. According to this witness, the imported red flying horse is the color of Japanese or Okinawan coral, but he has

never seen coral of that size, and such a piece of coral would be priceless. The white horse—according to the witness—resembles Burmese white jade. The green vase looks like emerald jade or emerald, while the purple vase looks like amethyst. He has never seen similar vases made of emerald or amethyst, nor a similar horse made of coral, but it is possible that such horses are made of white jade. The witness further testified that upon close examination the articles have no similarity to articles of semiprecious stone; however, in a subdued light he would say they were of semiprecious stone.

It is against the background of this record that we turn now to the legal aspects. Under present paragraph 1559 of the Tariff Act of 1930, as amended by the 'Customs Simplification Act of 1954, the test of similitude is that of use (except where an article equally resembles in use two or more articles). See e.g., *J. E. Bernard & Co., Inc.* v. *United States*, 64 Cust. Ct. 556, 560–61, C.D. 4035 (1970). In addition, the courts have consistently held that to constitute similarity in use, within the meaning of the similitude provision, the results of the use must be substantially the same and achieved in substantially the same way. *Murphy* v. *Arnson*, 96 U.S. 131, 133 (1877); *United States* v. *Godillot & Co.*, 3 Ct. Cust. Appls. 128, 130, T.D. 32382 (1912); *Ignaz Strauss & Co., Inc., et al.* v. *United States*, 45 Cust. Ct. 161, 163–64, C.D. 2218, 189 F. Supp. 259 (1960), and cases cited therein. In this setting, there is a presumption that the government made all the findings necessary to its classification. This being the case, since the government classified the imported vases and horses by similitude to articles composed of semiprecious stones, it necessarily determined that the imported vases and horses and articles of similar size, shape and color—but composed of semiprecious stone— are used in the same manner, for the same purpose, and to achieve the same results. Thus, it was plaintiffs' burden to rebut that determination. And as to this, the evidence presented by plaintiffs falls far short of rebutting that determination.

The only testimony regarding use is to the effect that the importations and their semiprecious stone counterparts are used as decorative items, e.g., displayed in breakfronts. It is true, as pointed out by plaintiffs, that there are distinctions in the quality, texture and material of the semiprecious stone articles, as compared to the imported plastic counterparts. However, these distinctions are not germane to the issue of use here. For in amending paragraph 1559—the similitude provision—in 1954, Congress did away with material, quality and texture as tests for similitude and confined the test to that of use, except where an article equally resembled in use two or more articles, in which case it was to be subject to the rate of duty applicable to

the one it most resembled with respect to material. See e.g., *Alex W. Block Company* v. *United States*, 61 Cust. Ct. 412, 415, n. 1, C.D. 3644, 294 F. Supp. 316 (1968); *J. E. Bernard & Co., Inc.* v. *United States*, *supra*, 64 Cust. Ct. at 560–61. For that reason, the courts have not considered differences in material, quality and texture except where, based upon its use, the merchandise equally resembled two enumerated articles. *Ignaz Strauss & Co., Inc., et al.* v. *United States*, 45 Cust. Ct. 161, C.D. 2218, 189 F. Supp. 259 (1960); *Chong Kee Jan Co., Inc., et al.* v. *United States*, 48 Cust. Ct. 439, Abstract 66728 (1962).

Without merit is plaintiffs' reliance on *Scientific Packaging Corp., et al.* v. *United States*, 54 Cust. Ct. 38, C.D. 2505 (1965), *aff'd*, 53 CCPA 34, C.A.D. 873 (1966). In that case, plastic laundry bags were classified by similitude to cotton laundry bags. The court found that the different qualities in texture and material alone were insufficient to overcome the presumptively correct classification by similitude to cotton laundry bags. In so holding, the court noted that the material, quality and texture of an article are irrelevant in considering similarity of use unless these factors have a direct affect upon the manner in which the article is employed or the purpose it achieves. Although the court found the plastic bags possessed special qualities which imparted to them the capacity to serve many purposes, it overruled the protest on the ground that the plaintiffs had not proven that they served any purpose other than the transportation of laundry to and from a launderette.

Consistent with *Scientific Packaging*, if plaintiffs wished to rely upon the theory that the quality, texture and material involved here directly affected the manner in which the merchandise is used and thus made them dissimilar from semiprecious stone articles, they should have produced evidence establishing what those varied uses are. However, there is no such evidence of record. In short, as in *Scientific Packaging*, plaintiffs have failed to show that the semiprecious stone articles were not used in a similar manner to the imported plastic articles. Instead of offering evidence which would establish dissimilarities of use between the two articles, plaintiffs merely argue that upon close examination the imported articles would not be mistaken for semiprecious stone counterparts because of physical differences, such as lack of fissures, color, weight, etc. However, the fact that similar articles are not identical does not preclude a classification by similitude. To the contrary, the similitude provisions apply only to articles which are different and distinct from the enumerated article. *United States* v. *Eckstein*, 222 U.S. 130, 136 (1911);

*S. S. Kresge Co., et al.* v. *United States*, 46 CCPA 100, 102–03, C.A.D. 707 (1959). Thus the physical differences here involved do not *per se* establish a dissimilarity of use for the purpose of the similitude provisions.

Plaintiffs also urge that "use for decorative purposes" is too broad a use to serve as a basis for finding a similarity within the meaning of the statute. We agree that "use for decorative purposes" is too general, but that is not what the government found, nor is it the presumptively correct determination which it was plaintiffs' burden to rebut. Rather, as we have seen before, implicit in the government's classification was a finding that there was a substantial similarity in purpose, results, and manner of use.

Plaintiffs' assertion that the government relied upon too general and broad a use similarity only takes on the cloak of plausibility in the present case because plaintiffs neglected to produce the more specific evidence of use required of them to rebut the presumption of correctness. Plaintiffs' logic is that since the record reveals very little about use, then it must be concluded that the government found only a general similarity in use. But the government's findings are not limited by the amount of proof plaintiffs produce for (to repeat) it is presumed that the government made all the findings necessary to its classification. In this connection, the type of evidence which plaintiffs were required to produce to establish that the government relied upon too general a use similarity is readily seen upon inspection of the cases relied upon by plaintiffs.

For example, in *Wecolite Company* v. *United States*, 38 Cust. Ct. 167, C.D. 1858 (1957), *aff'd*, 45 CCPA 54, C.A.D. 672 (1958), plastic mustard dispensers were classified by similitude to mustard dispensers of blown glass. The court held that use as a mustard dispenser was too broad a use to justify the invocation of the similitude provisions. The court found that "the mode of operation of * * * [the plastic dispenser], considered as an entirety, namely, by a plunger and compressed-air method, is substantially different from that of * * * [a blown glass dispenser] * * * which is operated in an altogether different manner." This difference, together with a wealth of evidence that no glass mustard dispenser was used in the same manner as the importation, prompted the court to conclude that there was no similarity of use between the two products. See also *United States* v. *Godillot & Co.*, 3 Ct. Cust. Appls. 128, T.D. 32382 (1912), where the evidence established that night lights were not similar to tapers because the results of use were not substantially the same and were not achieved in substantially the same way.

Plaintiffs' final claim, relying on *United States* v. *Freitag & Sons, Inc., et al.*, 21 CCPA 500, 507, T.D. 46961 (1934), is that merchandise must be commercially interchangeable in order to be considered similar for the purposes of the similitude provisions. The *Freitag* case, however, is irrelevant to any similitude issue since the court specifically pointed out that the similarity required by the button provision under consideration was entirely different from the similarity required by the similitude provisions. 21 CCPA at 507. Furthermore, plaintiffs' theory of commercial substitution was rejected by the Supreme Court in a decision which still stands as a leading case on similitude of use. *Murphy* v. *Arnson*, 96 U.S. 131, 133 (1877).

The short of the matter is that plaintiffs have failed to show dissimilarity in use as between the imported plastic articles and their semiprecious stone counterparts. Indeed, if anything, the meager evidence in the record as to use tends to support the government's classification. Thus, plaintiffs' witness stated that the sole use of the imported horses was for decoration, whereas the imported vases could be used for decoration or as vases. The witness also stated that he had observed horse statues and vases, composed of semiprecious stone, displayed in living room breakfronts and for sale in shops. Clearly, the imported items and the articles provided for in paragraph 233 are used in the same manner, as decorative items for display in the home in breakfronts and elsewhere.

Moreover, the ability of the imported articles to achieve the same decorative results as the semiprecious stone articles—and the fact that the imported articles were designed and produced with that purpose in mind—is established by examination of the coloring of the imported merchandise. Both witnesses at trial stated that from a distance the articles at issue would readily be mistaken for articles composed of semiprecious stone because of their colors. For example, one of the imported vases is the color of amethyst and one of the imported horses is the color of either coral or rose quartz. Further the packing lists indicate that the producer intended a resemblance in color to semiprecious stone since the articles were not designated by the usual name of colors but by terms such as emerald, lapis, sapphire, amethyst, jade green, agate, etc. There can be no doubt that it is the coloring and luster of a carved semiprecious stone which make it an appealing article of interest and decoration. The imported articles plainly duplicate these features and thus are used for the same purpose and achieve the same results through the same means.

The protests are overruled and judgment will be entered accordingly.