(C. D. 1858)

Wecolite Company *v.* United States

United States Customs Court, First Division

(Decided March 21, 1957)

*Siegel, Mandell & Davidson* (*Sidney Mandell* of counsel) for the plaintiff.
*George Cochran Doub*, Assistant Attorney General (*Murray Sklaroff*, trial attorney), for the defendant.

Before OLIVER, MOLLISON, and WILSON, Judges

WILSON, Judge: The merchandise involved in this case consists of certain plastic mustard dispensers which were classified under paragraph 218 (f) of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, T. D. 51802, supplemented by Presidential proclamation, T. D. 51898, at the rate of 50 per centum ad valorem as "blown" glass articles, by virtue of the similitude provisions of paragraph 1559 of said act. Plaintiff claims the merchandise properly classifiable under paragraph 218 (g) of the pertinent act, as modified by T. D. 51802 and T. D. 51898, *supra*, at the rate of 25 per centum ad valorem, by virtue of said similitude clause in paragraph 1559 of the act, as "pressed" glass table or kitchen articles, not polished. Alternatively, plaintiff claims that the merchandise is properly dutiable under paragraph 1558 of the act at the rate of 20 per centum ad valorem as "articles manufactured, in whole or in part, not specially provided for."

The pertinent provisions of the tariff act under consideration are as follows:

Paragraph 218 (f), as modified by T. D. 51802 and T. D. 51898, *supra*:

Table and kitchen articles and utensils, and all articles of every description not specially provided for, composed wholly or in chief value of glass, blown or partly blown in the mold or otherwise, or colored, cut, engraved, etched, frosted,

gilded, ground * * * painted, * * * whether filled or unfilled, or whether their contents be dutiable or free * * *:

| * | * | * | * | * | * | * | |
|---|---|---|---|---|---|---|---|
| Other | | | | | | | 50¢ on each article or utensil, but not less than 30% nor more than 50% ad val. |

### Paragraph 218 (g), as modified, *supra*:

| | |
|---|---|
| Table and kitchen articles and utensils, composed wholly or in chief value of glass, when pressed and unpolished, * * * | 25% ad val. |

### Paragraph 1558, Tariff Act of 1930:

That there shall be levied, collected, and paid on the importation of all raw or unmanufactured articles not enumerated * * * a duty of 10 per centum ad valorem, and on all articles manufactured, in whole or in part, not specially provided for, a duty of 20 per centum ad valorem.

### Paragraph 1559, Tariff Act of 1930, in effect at the time of entry herein:

That each and every imported article, not enumerated in this Act, which is similar, either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned; * * *.

An official sample of the imported merchandise was received in evidence as plaintiff's exhibit 1 (R. 2).

There was also received in evidence a mustard dispenser, a "Spert jar," having a metal top which contains the whole mechanism of the article, with a glass bottom (plaintiff's exhibit 2); a mustard jar or holder, composed of glass (plaintiff's illustrative exhibit 3); and a plastic mustard dispenser, similar to plaintiff's exhibit 1, which, however, is manufactured in the United States (plaintiff's illustrative exhibit 4).

On behalf of the plaintiff, a partner in the importing concern testified that the company manufactures mainly household gadgets, especially for the kitchen, such as, "cake decorators, cookie pressers, mustard dispensers, ketchup, cookie cutters," as well as condiment sets, salt and pepper shakers, and articles of that character. He stated that, in the production of such products, his company uses plastics, metal, glass, cotton, nylon, and various other materials (R. 4), and that among the glass items put out by his concern are glass basters and glass egg timers. The witness testified generally as to his experience as a manufacturer and distributor of household kitchen articles and similar articles, stating, in this connection, that over a period of 25 years he had attended numerous trade shows, both national and

international, and that his company had also exhibited household kitchen articles in this country, in Chicago and Atlantic City.

Plaintiff's witness stated that the merchandise represented by plaintiff's exhibit 1 is made from polystyrene; that it is molded in an injection molding machine; and that it is a plastic (R. 5–6). The witness then described the operation of plaintiff's exhibit 1 as follows:

The item consists of a bottom part which is moulded and has a plunger which has a rubber washer. When your bottom part is filled with mustard it is—you push the plunger in and then you screw on the top. The top has on the inside a spring and then you screw on the top and then the mustard squeezes out from here. In other words, each time you press down, the air is being compressed and pushes the mustard out here.

Plaintiff's witness testified that he had never seen a mustard dispenser composed of glass "that operates like plaintiff's exhibit 1" (R. 8). The witness further stated that he had endeavored to manufacture an item such as that at bar by making the bottom part out of glass and the other parts, the plunger and the top part, out of plastic, but that it was impossible to make the bottom part out of glass. The witness explained, in this connection, that, in the manufacture of such an item, it is necessary to have a precision molded base which could not be obtained by using glass, stating that glass expands and contracts more than plastic, whereas plastic, after it is molded, can be held to a very close tolerance, which is not the case when glass is used (R. 8, 18). The witness then expressed the opinion that the bottom portion of plaintiff's exhibit 2 is made of pressed glass (R. 10).

As to plaintiff's illustrative exhibit 3, the witness testified that the glass material contained therein is, like the glass portion of plaintiff's exhibit 2, also made of pressed glass, pointing out that "the parting line can be seen very clearly" (R. 11) and that the only portion of plaintiff's illustrative exhibit 3 that is plastic is the top (R. 12).

On cross-examination, plaintiff's witness testified that he had never been in the business of blowing glass "or blowing glass in the rod" (R. 14). He further stated that the "parting line" in the glass portion of plaintiff's exhibit 2 was similar to the "parting line" in the plastic molded products manufactured by his firm and that such "parting line" was an indication to him that the glass therein was molded, and that it was "pressed" glass, stating, in this connection, that "The mere fact that it has a parting line indicates that it cannot be blown." Subsequently, upon inquiry by the court as to whether or not the glass portion of plaintiff's exhibit 2 was blown, the witness (R. 15) stated:

I wouldn't say it was not blown, you may be able to blow it as well in fact, there are combination machines which will press and blow as well.

The witness then stated, however, that he knew for a fact that all types of mustard jars, or any type of dispenser made of glass, are made out of pressed glass; that blown glass is a much more delicate operation "the glass is finer and requires finishing afterwards" (R. 15–16). He then testified:

JUDGE WILSON: You don't have any seams or meeting lines on the blown glass article, do you?
WITNESS: No.

\*      \*      \*      \*      \*      \*      \*

X Q. Would a machine blown glass article show the same parting line as that you referred to on Plaintiff's Exhibit 2?—A. I would imagine no, but I can't say for sure.
X Q. You are not familiar with machine blowing?—A. No.

Plaintiff's witness, further testifying on cross-examination, reiterated previous testimony to the effect that, in manufacturing items such as plaintiff's exhibit 1, the bottom part could not be made out of glass of any kind.

The defendant, in support of the collector's classification, introduced the testimony of Mr. William R. Shapiro, assistant appraiser, United States Customs Service. He stated that he had been an examiner of glassware for 17 years and that, in the course of his duties in such position, he had learned to distinguish between articles made of blown glass and articles made of pressed glass, having visited glass manufacturing plants and observed the various operations of blowing glass and pressing glass. As to the differences found by him between pressed glass and blown glass, the witness testified as follows:

WITNESS: The basic differences are that an article which has a narrower top than the bottom cannot be pressed, it must be blown because the pressing is done by the insertion of a plunger into the mould and in order to use it, the top cannot taper upward, it can taper outward or have straight sides but the top can't taper inward. The appearance before polishing would distinguish pressed glass from blown glass, but if an article were polished you couldn't distinguish pressed or blown glass, if it were completely polished. (R. 20–21.)

He further testified that, before polishing, molded or pressed glass would have the parting line to help distinguish it from blown glass, but that, where a piece of blown glass had been polished and a piece of molded or pressed glass had been polished, the polishing would eliminate the parting line mark, and that, in such case, he could not distinguish between the pressed glass and the blown glass. The witness then testified that, if the article were tapered upward, he could distinguish it as pressed glass on that characteristic but that he could not distinguish between pressed glass and blown glass, when polished, on the basis of the mold seam alone (R. 22).

With respect to plaintiff's exhibit 1, specifically as to the thread on the article, defendant's witness testified that an article like that

could, in his opinion, be made of pressed glass, but that, as a practical matter, it was not, to his knowledge, so made in the trade. In explanation, the witness stated that a thread, such as that on top of plaintiff's exhibits 1 and 2, would be a dangerous article if pressed into glass, because of the roughness of the thread. As opposed to the testimony of the witness for the plaintiff, defendant's witness was of the opinion that the glass portion of plaintiff's exhibit 2 was made of blown glass, because of its luster; also by reason of the fact that "the screw portion of the top is narrower than the rest of the body" and because of the screw thread itself, and that it was "machine blown in a mould" (R. 25–26).

On cross-examination, defendant's witness testified that it is not possible to press an article which is narrower at the screw neck than the rest of the body itself "because it would not be possible to pull the plunger out" (R. 28). He then stated that plaintiff's exhibit 1 has the same dimensions at the base as at the top or neck. The witness agreed that he had never seen a mustard dispenser that operates in the same manner as plaintiff's exhibit 1; that the mustard dispensers with which he was familiar did not have the plunger operation; and that they differed materially from the involved article in construction. Defendant's witness further agreed that plaintiff's exhibit 2 was composed of metal and glass (R. 29–30).

The application of the similitude provisions of the tariff act to imported merchandise has been passed upon by this and our appellate court on numerous occasions.

In *Mary G. Ricks* v. *United States*, 33 C. C. P. A. (Customs) 1, C. A. D. 308, pages 6 and 7, our appellate court stated:

* * * This court, at various times, has considered the meaning of the term "similar, either in material, quality, texture, or the use to which it may be applied." Probably the fullest expression by this court as to the meaning of this term is to be found in the case of *Pittsburgh Plate Glass Co.* v. *United States*, 2 Ct. Cust. Appls. 389, T. D. 32162, wherein it was held that mats of unwoven hair were dutiable by similitude under the provision for "unwoven felt in part of wool" in paragraph 382 of the tariff act of 1909. The court held that the imported merchandise contained no wool, but that its use controlled its classification under the similitude provision. In discussing the above-quoted phrase, after holding that the material was used solely in connection with plate glass manufacture as were the comparable woolen articles directly provided for under the term "felt in part of wool," the court stated, in substance, that in considering similitude of use the question as to what *effect* similar uses might have when the two articles were compared was important. It quoted from *Pickhardt* v. *Merritt*, 132 U. S. 252, the following:

* * * the mere application to the dyeing of fabrics would not create the similitude, but * * * if there was a similitude in the mode of use, a similitude in the same kind of dyeing, producing the same colors in substantially the same way, so as to take the place of aniline dyes in use, there would be a similitude in use * * *.

It also quoted from *Murphy* v. *Arnson*, 96 U. S. 131, relating to similitude of use, the statement that similitude "plainly refers to its employment, or its effect in producing results." * * *

In the *Pittsburgh Plate Glass Co.* case, *supra*, our appellate court, page 392, in disposing of the question of similitude, used the following language:

> The sole remaining question is whether or not there is a similitude of *use* between the imported article and felts made wholly or in part of wool. The uncontradicted testimony is that for many years last past there has been, and now is, imported into and manufactured in the United States and known to its commerce an article which concededly is a felt made wholly or in part of wool used solely in connection with plate glass manufacturing operations for the purpose of polishing the plate glass. Invention seems to have improved upon this process and devised what is known as the Belgium plate-glass machines. As a part of these machines as a polishing agency it has been made practical to use a less expensive polishing apparatus, to wit, the imported felts, mats, or whatever the imported articles may be styled. It appears from the uncontradicted testimony in the record that the method of using each of the articles is somewhat different, incident to the difference in the machinery employed, but they are used substantially in the same manner. In the one case motion of a certain direction is had, while in the other motion of a different direction is given. The result in each case is identical, so that it seems to us that the conclusion is inevitable that there is a similitude, though not an identity in the mode of use.

The merchandise in the *Ricks* case, *supra*, was a product made from the manipulation of barley in the production of malt. It was used as an animal feed and was produced in the malt-making operation by separating and removing certain components of the barley not wanted in the manufacture of the main product—malt. These components comprised beards, awns, foreign seeds, such as wheat, broken kernels, straw, etc., which, together with barley sprouts and screenings, all byproducts of brewing processes, were beaten to a fine consistency, and, in that condition, were imported and sold as barley bran. The merchandise in question was classified under paragraph 1558 of the Tariff Act of 1930 at the rate of 20 per centum ad valorem as a nonenumerated manufactured article. The importer claimed the merchandise dutiable at the rate of 5 per centum ad valorem directly under paragraph 730 of said act, as modified, as "by-product feeds obtained in milling wheat or other cereals," or by similitude to the byproduct feeds provided for in said paragraph 730, or, alternatively, at the rate of 7½ per centum ad valorem under paragraph 1555 of said act, as modified, as "Waste, not specially provided for." Our appellate court held the involved product was not a byproduct feed obtained in the milling of wheat or other cereals, such as that provided for in the provisions under which it was claimed dutiable, and stated, in this connection, page 4, as follows:

> * * * Even if it were assumed that the screening, separating, and mixing of grain such as barley are steps in a milling operation, it is obvious that the mer-

chandise is obtained only in part by such operations. Screening and separating grains from undesired constituents are processes frequently performed without any relevancy to the milling of cereals, as the term "milling" is commonly understood. The same is true of mixing.

\* \* \* In the instant finished malted product, \* \* \* the so-called inner skin comparable to the wheat skin has not been removed; and the imported product does not contain any portion of that part of the barley malt which is comparable to the bran from wheat. It, of course, does contain a small quantity of bran which comes from some of the foreign seeds and from wheat and broken grains. In appearance and characteristics it does not resemble bran, although it is frequently called "barley bran."

Accordingly, the appellate court, in the *Ricks* case, *supra*, found that, since the involved merchandise was a product of a malt-producing process, it was not the product of a cereal-milling process and, therefore, held that the importer's claim that the merchandise was dutiable under said paragraph 730 as a byproduct feed obtained in the milling of a cereal was untenable and upheld the holding of the trial court that the involved product was properly dutiable, as classified, under paragraph 1558 of the tariff act as a nonenumerated manufactured article.

The plaintiff in the *Ricks* case, *supra*, in urging that the imported product should be held dutiable under paragraph 730 of the tariff act, by similitude, contended, *inter alia*, that the involved merchandise was similar in use to the byproducts provided for in said paragraph, since it was sold for animal feed purposes and for no other use. On this point, the appellate court, at page 7, stated:

But we know of no holding in cases like the instant one that it is sufficient to prove that the material is used for feeding cattle. While appellant, in her brief, makes one statement to the effect that the testimony shows that the material was sold for feedstuffs and for no other purpose and was fed to farm animals in its imported condition, we find no definite support in the record for the contention that it discloses that the merchandise is fed to farm animals in its imported condition. However, even if this could be spelled out from the record, it would not affect our conclusion. It is not sufficient proof of similitude of use, as applicable to the issue involved here, to show that the merchandise is used for and sold as an animal feed or as feed for cattle, in its imported condition. It was held in *C. J. Tower & Sons* v. *United States*, 25 C. C. P. A. (Customs) 408, T. D. 49486, that merely because the imported merchandise there involved was used as a food for animals was not sufficient proof of similitude of use. See also *Corporacion Argentina de Productores de Carnes* v. *United States*, 29 C. C. P. A. (Customs) 288, 297, C. A. D. 204. It has been pointed out frequently that hay is food for animals, but its use is not similar to that of cereals. It is true that to be similar, it does not necessarily have to contain all the same ingredients or have exactly the same effect upon the animal; but its effect should be similar, because prepared feeds are frequently used and fed for different purposes and with wholly different results.

Appellant has not here sought to prove that the instant merchandise, consisting of a mixture of the various undesirable portions of barley not needed for malt purposes, took the place of such by-product feeds as are provided for in paragraph 730, or that the feeding results are similar to those of such feeds, or, for that matter,

to those of mixed feeds. The *Pittsburgh Plate Glass* case, *supra*, and the cases therein cited, together with the *Corporacion Argentina* case, *supra*, and the *Tower* case, *supra*, are abundant authority for holding that in the case of feedstuffs or mixed feeds, where similitude is to be proved, it is not sufficient merely to show that the imported merchandise is used for cattle or animal feed, as are some of the articles provided for in paragraph 730.

In *Roovers Bros., Inc.* v. *United States*, 23 Cust. Ct. 53, C. D. 1190, so-called "Gloy" C paste, an adhesive, used in packaging cartons and for sticking papers or documents together, was held not classifiable as "soluble or chemically treated starch" either directly, under paragraph 84 of the Tariff Act of 1930, or by similitude, under paragraph 1559 of the said act, but properly dutiable under paragraph 1558 of the tariff act as a nonenumerated manufactured article. In so holding, the court, page 55, stated:

> In urging classification under paragraph 84, *supra*, by similitude, as "soluble or chemically treated starch," plaintiff relies on the matter of use, pointing to testimony to the effect that both the imported product and the merchandise directly provided for in said paragraph 84 are used as adhesive agents. * * *
>
> Classification by similitude of use is not satisfied by a mere showing of general usage of two comparable products. There must be a substantial sameness in the method of use and the effect, or productive result, of the two products. *Pickhardt* v. *Merritt*, 132 U. S. 252, * * *.

The court, in the *Roovers Bros., Inc.*, case, *supra*, at pages 57–58, further stated:

> * * * A mere superficial sameness in some element of similarity is not sufficient. The record before us is not nearly sufficient to establish for the "Gloy" C paste in question a classification of soluble or chemically treated starch, by similitude of use. First of all, the plant manager's statement that his use of chemically treated starch as an adhesive agent has been "intermittently," implies an occasional or fugitive use rather than chief use, as required for tariff classification predicated on use. *United States* v. *Boker & Co.*, 6 Ct. Cust. Appls. 243, T. D. 35472. Then, too, the testimony fails to establish the essentials of comparable mode of use and effectiveness between the imported product and the substance directly provided for in the tariff act.

Much of the testimony in this case was directed to the question whether plaintiff's exhibit 2 was made of "blown" glass or "pressed" glass, the defendant, in this connection, maintaining that it was made of blown glass, while the plaintiff, on the other hand, particularly because of the so-called "parting line" on the exhibit, contended that the said article was made of pressed glass. However, in view of our determination in this case, we deem it unnecessary to decide this point.

The testimony in this case, adduced on behalf of the defendant, is to the effect that plaintiff's exhibit 2 represents the only type of mustard dispensers composed of metal and glass (R. 30). The Government's witness had not seen any plastic article, such as that represented by plaintiff's exhibit 1, other than the article represented

by the latter exhibit, and he had not seen any articles like plaintiff's exhibit 2 composed of plastic in part with a plastic base (R. 31).

The record in the case establishes that there is no article in use which is operated in the same manner as the imported article, other than a domestic article, which is similar in construction and composition and which operates in the same manner as the dispensers here imported. Plaintiff's exhibit 2, which apparently, in this case, was the type of dispenser used as a criterion to support classification of the imported merchandise, by similitude, is quite substantial in construction and embodies a "spring" mechanism, the glass base therein acting merely as a container. While the container portion of plaintiff's exhibit 1 might be said to be similar in use to the base and glass portion of plaintiff's exhibit 2, inasmuch as that part of the article serves as a container for the contents, the mode of operation of exhibit 1, considered as an entirety, namely, by a plunger and compressed-air method, is substantially different from that of plaintiff's exhibit 2. This essential difference, in our opinion, precludes a finding that the imported merchandise should be held dutiable, by similitude to a mustard dispenser, represented to be of blown or partly blown glass (plaintiff's exhibit 2), which is operated in an altogether different manner.

The mere fact that the imported articles hold, and are used to dispense, mustard, and that, in their end use, they are thus employed for the same purpose as is indicated for certain blown glass dispensers does not constitute, in itself, in our opinion, a "substantial resemblance" to support the application of the similitude clause to the imported merchandise, by virtue of similitude of "use," as is here contended by the defendant.

It may further be observed that it is a matter of common knowledge that there is a great variety of mustard dispensers, which are used for the purpose of holding and dispensing mustard, and that articles so employed are of varied composition. In this connection, we likewise deem it unnecessary to decide whether the differences in composition between the two articles here presented for our consideration are such as to warrant a finding against the application of the similitude provisions to the imported merchandise. However, in passing, we call attention to the latest expression of our appellate court on the question of similitude in *Maher-App & Company* v. *United States*, 44 C. C. P. A. (Customs) 22, C. A. D. 630, decided November 30, 1956. In holding that artificial teeth, composed of a plastic material, were not properly classified, by similitude to china, porcelain, and vitreous wares, under paragraph 212 of the Tariff Act of 1930, as modified, the court, *inter alia*, stated:

It also seems proper to note, in connection with similitude of use that, as pointed out by appellant, it is a matter of common knowledge that artificial

teeth are made of substances other than porcelain, including gold, enamel, and ivory, which are provided for *eo nomine* in the Tariff Act of 1930.  If material, texture, and quality are disregarded, there appears to be no more reason for classifying the instant merchandise by similitude to porcelain teeth than to any of the other materials of which artificial teeth are made.

In the case at bar, no similarity in material, quality, texture, or use being established, we find and so hold that the imported merchandise is not properly classifiable under paragraph 218 (f) of the Tariff Act of 1930, as modified, by similitude to blown or partly blown glass articles therein provided for.  Not being otherwise provided for in the tariff act, we hold the importation at bar properly dutiable at the rate of 20 per centum ad valorem under paragraph 1558 of the Tariff Act of 1930 as "articles manufactured, in whole or in part, not specially provided for," as alternatively claimed.  To the extent indicated, the protest is sustained.

Judgment will be entered accordingly.