QMS, INC., PLAINTIFF *v.* UNITED STATES, DEFENDANT

Court No. 92–02–00103

(Decided April 18, 1995)

*Powell, Goldstein, Frazer & Murphy (Richard M. Belanger, Robert Torresen, Jr.)* for plaintiff.
*Frank W. Hunger,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, United States Department of Justice, *(John J. Mahon);* of counsel: *Laura R. Siegel,* Office of Assistant Chief Counsel, International Trade Litigation, United States Customs Service, for defendant.

## OPINION

MUSGRAVE, *Judge:* In this test case, plaintiff QMS, Inc. ("QMS") challenges the denial by the United States Customs Service ("Customs") of six protests filed pursuant to Section 514 of the Tariff Act of 1930, as amended, 19 U.S.C. § 514 (1988), contesting the tariff classification of certain imported color ink sheet rolls ("ISRs"), imported by QMS through the port of Mobile, Alabama in a series of entries which took place between December, 1989 and September, 1990. Customs classified the articles under subheading 9612.10.90 of the Harmonized Tariff Schedule of the United States ("HTSUS"), covering "Typewriter or similar ribbons * * * : Ribbons: Other," carrying a duty of 9% *ad valorem.* Plaintiff contends that ISRs are properly classified under subheading 8473.30.40, HTSUS, which covers "Parts and accessories suitable for use solely or principally with machines of headings 8469 to 8472: Parts and accessories of the machines of heading 8471: Not incorporating a cathode ray tube," merchandise which is entitled duty-free entry. This Court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (1988).

## BACKGROUND

The parties have stipulated to the following: Color ISRs are specially designed for use solely in color thermal transfer printers which are used to print graphics with automatic data processing equipment. *Statement of Material Facts ("St. Facts")* at 2–3, Exhibit B to *Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ("Plaintiff's Memo"). See also Defendant's Response to Plaintiff's Statement of Material Facts.* Color ISRs contribute to the efficient operation of color thermal transfer printers. *St. Facts* at 4. Thermal transfer printers could not function as intended without color ISRs. *Id.* at 5. In their condition as imported, color ISRs consist of a thin polymer *(i.e.,* plastic) film to which has been applied paraffin wax pigments (or "inks") in varying color configurations *(i.e.,* yellow, magenta, cyan, and black). *Id.* at 6. ISRs vary in size, depending on the color thermal trans-

fer printers for which they are specially designed, between 228 and 325 millimeters in width, between 105 and 297 meters in length, and between 50 and 74 millimeters in diameter when tightly wound around a reinforced cardboard core. *Id.* at 7. The color thermal transfer printing process is based on the subtractive color mixture process and involves the following steps:

(a) The color ISR and the paper are carefully positioned together.

(b) The printer's thermal heater unit heats and melts the wax pigments from the back of the base film.

(c) The wax pigments are heat-fused to the paper and adhere by means of a thermally-induced mechanical bond.

(d) The color ISR is advanced until the second desired color is carefully positioned next to the paper.

(e) The thermal heater unit heats and melts wax pigments of the second desired color, the ISR is advanced to the third desired color, and so on until all colors have been sequentially overprinted onto the paper.

*Id.* at 8. Up to seven colors can be transferred to the paper by means of the subtractive color mixture process, in which the three subtractive colors are laid sequentially upon one another. *Id.* at 9. In the thermal printing process, pigmented wax is never transferred to the paper by means of impact. An image is transferred to the paper when the pigmented wax on the ISR is melted by the heating elements in the printer's thermal heater unit. The transfer is completed, and the image quality is improved, when the paper and the molten wax are pressed together by the constant pressure of the rubber platen roller and the print head. *Id.* at 10. In the thermal transfer printing process, wax pigments are transferred to the paper by means of heat and pressure. *Id.* at 11. In order to achieve highly accurate placement of the color ISR relative to the paper for sequential overprinting, the ISR is designed and manufactured to provide continuous positional electronic feedback to the printer. *Id.* at 12. Continuous electronic positional feedback is accomplished by means of "color marks" and "page marks" precisely located on the edges of the color ISRs. *Id.* at 13.

In addition to the facts stipulated to, the parties put forth sworn declarations in support of their respective positions. Customs put forth the declaration of Arthur Brodbeck, a Customs employee and a National Import Specialist for office machinery since 1980, in which Mr. Brodbeck states that on the basis of research he conducted as to the trade understanding of the merchandise and the terminology used by the industry, his attendance of trade association meetings, and his examination of reference books, trade catalogues, journals and brochures, and his experience with automatic data processing equipment, he has concluded that the merchandise at issue is referred to by the automatic data processing equipment trade as thermal transfer ribbons. Attached to Mr. Brodbeck's declaration are copies of pages from computer supply catalogues which Mr. Brodbeck claims support his conclusion. *Declara-*

*tion by Arthur Brodbeck ("Brodbeck's Declaration"), Memorandum in Support of Defendant's Cross-Motion for Summary Judgement and in Response to Plaintiff's Motion for Summary Judgment ("Defendant's Memo"),* Appendix C.

QMS put forth the declaration of Douglas W. Obrecht, Director, Engine Technology at QMS since 1990. Prior to being employed by QMS, Mr. Obrecht was employed at Dataproducts, Inc. from 1984 to 1987, and at Genicom Corporation from 1987 to 1990. Both companies are computer printer manufacturers. Mr. Obrecht holds a B.S.E.E. degree from Northrup University, California. He has performed the duties of Project Manager for all QMS color products using thermal transfer printing technology. As Director, Engine Technology, he is in daily contact with a broad spectrum of the thermal printing industry which includes manufacturers, technical engineers, suppliers, marketing personnel, *etc.* He states that he is also familiar with the many reference books, trade catalogues, technical specifications, journals and brochures. He further states that on the basis of his experience in the thermal printing industry and of his familiarity with industry sources, he has concluded "that ink sheet rolls of the type at issue are widely and commonly referred to in the industry as 'rolls,' and this reference is used more often as the 'ribbons' referred [*sic*]." Attached in support of his declaration are copies of pages of a trade catalogue which describes the merchandise at issue as "rolls." Also attached are copies of purchase orders referring to the merchandise at issue as "rolls." *Declaration of Douglas W. Obrecht ("Obrecht Declaration"), Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment, and Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ("Plaintiff's Reply"),* Appendix A. Lastly, QMS submitted to this Court an exemplar of the imported article. *("Exemplar").*

The relevant statutory provisions of the HTSUS for 1990[1] are set out below:

*Classified under:*

| | |
|---|---|
| 9612 | Typewriter or similar ribbons, inked or otherwise prepared for giving impressions, whether or not on spools or in cartridges; ink pads, whether or not inked, with or without boxes: |
| 9612.10 | Ribbons: |
| 9612.10.10 | Measuring less than 30 mm in width, permanently put up in plastic or metal cartridges (whether or not containing spools) of a kind used in typewriters, automatic data processing or other machines * * * |
| 9612.10.90 | Other .......................... 9% |

---

[1] The relevant provisions of the HTSUS are the same in all respects for 1989 and 1990.

*Claimed under:*

| | |
|---|---|
| 8473 | Parts and accessories (other than covers, carrying cases and the like) suitable for use solely or principally with machines of headings 8469 to 8472: |
|        * |    *      *      *      *      *      * |
| 8473.30 | Parts and accessories of the machines of heading 8471: |
| 8473.30.40 | Not incorporating a cathode ray tube .......................... Free |

| | |
|---|---|
| 8471 | Automatic data processing machines and units thereof; magnetic or optical readers, machines for transcribing data onto data media in coded form and machines for processing such data, not elsewhere specified or included: |
|        * |    *      *      *      *      *      * |
| 8471.92 | Input or output units * * *: |
|        * |    *      *      *      *      *      * |
| | Printer units: |
| 8471.92.65 | Assembled units incorporating at least the media transport, control and print mechanisms |

## DISCUSSION

This case is before the Court on cross motions for summary judgment. The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. R. 56(d). Customs' classification decision is presumed to be correct. The burden of proving otherwise rests with the party challenging that decision. 28 U.S.C. § 2639(a)(1) (1988). The Court is obligated to determine whether Customs' classification is correct both independently and in comparison with QMS's proposed classification. Where the Court determines both classifications to be incorrect, the Court may decide the correct classification or remand where it deems appropriate. *Jarvis Clark Co. v. U.S.,* 733 F.2d 873, 878, 881, *reh'g denied,* 739 F.2d 628 (Fed. Cir. 1984).

QMS argues that Customs' classification is not correct because ISRs are not "typewriter" ribbons and are not "similar ribbons." QMS argues that the parties stipulated that ISRs are not intended for and are not capable of use in typewriters. *Plaintiff's Memo* at 9. QMS argues that for ISRs to be similar they must be substantially similar based on design, construction, function and use, citing *J.E. Bernard & Co., Inc. v. United States,* 63 Cust. Ct. 390, 398, C.D. 3924 (1969). *Plaintiff's Memo* at 10. QMS argues that ISRs are dissimilar in design, construction, function and use. *Id.* at 11.

QMS asserts that by common meaning ribbons are narrow, whereas ISRs are not narrow.[2] *Id.* In addition, QMS maintains that this position is supported by various Customs Headquarter Ruling Letters, as well as the Notes to Chapter 58 of the HTSUS.[3] *Id.* at 12–13.

Apart from dissimilarity in size, QMS argues that ISRs are designed and constructed differently than typewriter ribbons in other important ways—ISRs are coated with alternating color configurations throughout their length whereas, by contrast, typewriter ribbons are uniformly inked along their length. *Id.* at 13–14. In addition, ISRs have color marks and page marks to allow for precise positioning for overprinting. *Id.* at 14.

QMS further argues that ISRs are not similar to typewriter ribbons in function and use. *Id.* at 15. Typewriter ribbons are struck, whereas ISRs are heated to melt the wax pigments onto the paper which is then pressed with a roller. *Id.* QMS asserts that even though both a typewriter and a thermal transfer printer can produce printed documents, this does not mean that the items are similar within a tariff provision. *Id.* at 16. Lastly, QMS argues that the Explanatory Note 96.12[4] excludes thermal transfer ribbons by virtue of including only machines which incorporate devices for impact printing. *Id.* For the above reasons, argues QMS, ISRs are more complex and substantially dissimilar to typewriter ribbons in design, construction, function and use.

Customs argues that the merchandise in issue is appropriately termed a "ribbon" as that term is used in the tariff classification. Customs further argues that the definition cited by QMS for the term "ribbon" contemplates ISRs, as QMS quoted only a portion of that definition.[5] *Defendant's Memo* at 10–11. Moreover, argues Customs, the Chapter Note and Explanatory Note referred to by QMS to support its

---

[2] QMS cites *Webster's Third New International Dictionary* (1986), which defines ribbon as "a flat or tubular narrow fabric closely woven in various constructions." In addition, QMS cites *American Heritage Dictionary* (1978), which defines ribbon as "a narrow strip or band of fine fabric."

[3] QMS points to Note 5 of Chapter 58, Section XI, HTSUS, which states:

   5. For the purpose of heading 5806, the expression *"narrow woven fabrics"* means:
      (a) Woven fabrics of a width not exceeding 30 cm * * * .

Heading 5806 is set out as follows:

| 5806 | Narrow woven fabrics * * * : | | | | | |
|---|---|---|---|---|---|---|
| * | * | * | * | * | * | * |
| | Other woven fabrics: | | | | | |
| * | * | * | * | * | * | * |

   Ribbons .................................................................................. 9%

[4] Explanatory Notes of the Harmonized Commodity Description and Coding System, Note 96.12 is set out as follows:

   Ribbons, whether or not on spools or in cartridges, for typewriters, calculating machines, or for any other machines incorporating a device for printing by means of such ribbons (automatic balances, tabulating machines, teleprinters, etc.).

Explanatory Notes of the Harmonized Commodity Description and Coding System, Section XX, Note 96.12, p. 1609 (1986).

[5] Customs cites *Webster's Third New International Dictionary* (1981) for the definition of ribbon, as follows:

   **ribbon** * * * **2:** a long narrow strip resembling or suggestive of a ribbon: as .* * * **b:** a board framed into the studs to support the ceiling or floor joists **c:** a straight or crumpled varicolored stripe across slate that shows the location of the original bedding * * * **e(1):** a strip of inked fabric (as in a typewriter) on which the type faces strike and which prints the type characters on a sheet below **(2):** a continuous roll of paper that regulates casting in the monotype **f(1):** the form in which molten glass is taken from the furnace in the manufacture of some types of glass **(2):** a pressed and flattened sliver ready for spinning **g:** a bookmark consisting of a length of material often attached by one end to the top headband of the book * * * .

contention that ISRs are not ribbons, as that term is used in the tariff classification, are either misconstrued or inapplicable.[6] *Id.* at 11–12; *Defendant's Response to Plaintiff's Reply to Defendant's Opposition to Plaintiff's Motion for Summary Judgment and to Plaintiff's Response to Defendant's Cross-Motion for Summary Judgment ("Defendant's Response"),* at 9. In addition, Customs cites *Brodbeck's Declaration* to assert that the common and commercial meaning of ribbon encompasses ISRs. *Id.* at 15.

Customs further argues that the merchandise falls within the other terms of heading 9612 and Explanatory Note 1 to 96.12, because it is a ribbon "inked or otherwise prepared for giving impressions * * * ," and because the parties agree that the merchandise has been inked. *Id.* at 12. Customs asserts that the parties agree that "[i]n the thermal transfer printing process, wax pigments are transferred to the paper by means of pressure," and that the use of such pressure satisfies the requirements for making an impression. *Id.* at 13, 16. Customs also argues that there is no requirement that the merchandise be used in the traditional sense as long as the result is print. Customs argues that since thermal transfer printers print, and printing involves the transfer of ink and an impression, ISRs are, therefore, inked or otherwise prepared for giving impressions. *Id.* at 13–15.

The Court is persuaded by plaintiff's arguments that ISRs are not typewriter or similar ribbons as these terms are used in HTSUS heading 9612. The parties have stipulated that ISRs are not intended for nor capable of use with a typewriter. *St. Facts* at 2. Hence, ISRs are plainly not typewriter ribbons. As for the term *similar,* the Court sees little point in using dictionary definitions to interpret that term, for it has appeared in various provisions of the tariff laws of the United States, and has many times been interpreted by the predecessors of this Court and the Court of Appeals for the Federal Circuit ("CAFC"). Previous tariff laws contained *similitude* clauses which essentially provided that articles not enumerated in the tariff schedules, but which bear a similitude to, or are similar to, either in material, quality, texture, or use, any enumerated article in the tariff schedules, are dutiable at the rate of the enumerated article which the unenumerated article most resembles.[7]

---

[6] Customs argues that Note 5 of Chapter 58, applies only to textiles, not plastic ribbons such as ISRs. *See* Note 3, *supra.* In addition, Customs argues that the Explanatory Note 1 of 96.12, Note 4, *supra,* only requires that the machines listed incorporate a device for printing by means of such ribbons, whether or not they incorporate an impact printing device.

[7] Revised Statutes, § 2499 provided:

There shall be levied, collected, and paid, on each and every nonenumerated article *which bears a similitude,* either in material, quality, texture, or the use to which it may be applied, to any article enumerated in this title as chargeable with duty, the same rate of duty which is levied and charged on the enumerated article which it most resembles in any of the particulars before mentioned * * * (emphasis added). Revised Statutes, § 2499 (1874).

Paragraph 1559 of the Tariff Act of 1930, provided:

That each and every imported article, not enumerated in this Act, *which is similar,* either in material, quality, texture, or the use to which it may be applied to any article enumerated in this Act as chargeable with duty, shall be subject to the same rate of duty which is levied on the enumerated article which it most resembles in any of the particulars before mentioned * * * (emphasis added). Paragraph 1559 of the Tariff Act of 1930, previously codified at 19 U.S.C. § 1001.

19 U.S.C. § 1202 provided:

While the HTSUS has no such clause, and a similitude analysis is not warranted here, the meaning given by this Court's predecessors to the terms *similitude* and *similar* as they appear in these clauses are nevertheless instructional and warrant this Court's consideration as it interprets the term "similar" contained in heading 9612 of the HTSUS.

In *Pickhardt v. Merritt,* 132 U.S. 252 (1889), the United States Supreme Court held that the following jury instructions were within the law as provided in Revised Statutes, § 2499 (1874)[8], as the jury considered whether certain dyes or colors were properly classified by Customs as aniline dyes or bearing similitude thereto:

> [T]hat, if any one of the articles bore a similitude or resemblance, in material or quality, to what were known as aniline dyes in 1874, it was dutiable at the same rate as an aniline dye; that if either of them bore a similitude in the use to which it might be applied, to aniline dyes known and in use in 1874, it was dutiable at the same rate as an aniline dye; that the mere application to the dyeing of fabrics would not create the similitude, but that if there was a similitude in the mode of use, a similitude in the same kind of dyeing, producing the same colors in substantially the same way, so as to take the place of aniline dyes in use, there would be a similitude in use; * * *

*Pickhardt v. Merritt*, 132 U.S. 252, 258 (1889).

In *United States v. Godillot & Co.,* 3 Ct. Cust. App. 128 (1912), the Court of Customs Appeals affirmed a decision of the Board of General Appraisers which sustained a protest by an importer who argued that Customs had improperly classified certain night lights as tapers or by similitude to tapers[9]. The Court stated:

> In use, in construction, and in results accomplished night lights partake more of the characteristic features of oil lamps, and neither in materials nor the use to which they are applied are they similar to tapers or taper candles. That night lights and tapers are designed to be lighted and when lighted give a light is not enough to constitute similitude of use. To constitute similitude of use the results of the use must be substantially the same and achieved substantially in the same way. *Pickhardt v. Merritt* (132 U.S., 252, 258). It seems to us that there is no more reason for saying that a night light is similar to the modern taper or to the taper candle than there is for saying that a modern candle is similar to a match or that the candle itself is similar to the kerosene lamp. Tapers, matches, candles,

---

Any article, not provided for elsewhere in these schedules:

*Which is similar* in the use to which it may be applied to any article or articles enumerated in any of the foregoing of these schedules as chargeable with duty (emphasis added):

| 798.00 | Most resembling as to use a particular enumerated article chargeable with duty [shall be charged the] same rate of duty as the particular article which it most resembles as to use. |
|---|---|
| 798.50 | Not most resembling as to use a particular enumerated article chargeable with duty, but equally resembling as to use two or more enumerated articles with duty [shall be charged t]he rate of duty applicable to that one of such two or more articles which it most resembles in respect to the materials of which it is composed. |

19 U.S.C. § 1202, *as set forth in* Tariff Schedules of the United States Annotated (1986).

[8] Note 7, *supra.*

[9] "Celtic for torch, * * * a special form of candle the diameter of which gradually diminished from base to top* * * . [F]ormerly called a 'spill' —that is to say, a slender strip of inflammable material employed to light lamps or candles." *United States v. Godillot & Co.,* 3 Ct. Cust. App. 128, 129 (1912). These articles were provided for under paragraph 436 of the Tariff Act of 1909.

taper candles, kerosene lamps, and electric bulbs all furnish light, some for brief, some for longer periods; but that fact, standing by itself, can hardly be said to rank them as articles of similar use.

*United States v. Godillot & Co.,* 3 Ct. Cust. App. at 130.

In *Wecolite Company v. United States,* 38 Cust. Ct. 167, C.D. 1858, *aff'd,* 45 CCPA 54, C.A.D. 672 (1958), the Customs Court was asked to decide whether Customs properly classified a plastic mustard dispenser with a plunger-like screw top that employed compressed air to dispense the mustard. Customs classified the article at the rate of 50% *ad valorem,* as articles of "blown glass" by use of the similitude clause of paragraph 1559.[10] Plaintiff claimed the article was dutiable at a rate of 20% *ad valorem* under paragraph 1558, as a manufactured article not specifically provided for in the tariff schedules. The Court found that the glass container portion of the criterion article used by Customs to classify the imported plastic dispenser might be said to be similar in use to the imported article inasmuch as that portion of the article serves to contain mustard, but that the mode of operation of the imported article, considered in its entirety, namely, by a plunger and compressed-air method, is substantially different from the criterion article used by Customs. *Id.* at 176. The Court went on to say:

> The mere fact that the imported articles hold, and are used to dispense, mustard, and that, in their end use, they are thus employed for the same purpose as is indicated for certain blown glass dispensers does not constitute, in itself, in our opinion, a "substantial resemblance" to support the application of the similitude clause to the imported merchandise, by virtue of similitude of "use," as is here contended by the defendant.

*Id.* at 176. The Court also found no similarity in material, quality, or texture, and held that Customs improperly applied the similitude clause in classifying the imported merchandise as an article of blown glass. *Id.* at 177.

Apart from similitude clauses, the term *similar* has been more recently interpreted as it appeared in a specific tariff classification. In *J. E. Bernard & Co., Inc. v. United States,* 63 Cust. Ct. 390, C.D. 3924 (1969), the Customs Court considered whether imported "Magna-sighters," which consisted of two lenses mounted in a plastic frame with adjustable straps for fitting the head and were used to magnify objects approximately 14 inches away from the eyes, were more properly classifiable under item 708.85 (Hand magnifiers, magnifying glasses, loupes, thread counters, and *similar* articles (emphasis added)), as classified by Customs, or under item 708.45 (Eyeglasses, lorgnettes, goggles, and *similar* articles, all the forgoing whether used for corrective, protective, or other purposes; * * * (emphasis added)), as claimed by plaintiff. The Court determined that the imported items were similar to the items

---

[10] Note 7, *supra.*

listed in Customs' classification (708.85) from the standpoint of being used to magnify objects. The Court nonetheless held for plaintiff saying:

> But this is too general a "similarity" to dictate classification under the latter item. It is a matter of common knowledge that many articles of commerce are used to magnify objects. This does not mean, however, that they are "similar" to hand magnifiers, magnifying glasses, loupes or thread counters in the sense used in item 708.85. Clearly, the "similarity" required by item 708.85 is something more than the mere capacity to magnify; it means something similar in design, construction, function and use. From that standpoint, the magna-sighter is totally dissimilar to the articles mentioned by name in item 708.85.

*J. E. Bernard & Co., Inc. v. United States*, 63 Cust. Ct. at 398.

Most recently the CAFC has used the rule of *ejusdem generis* to interpret the term *similar* as that term is used in various provisions of both the Tariff Schedules of the United States and HTSUS. In *Sports Graphics, Inc. v. United States,* 24 F.3d 1390 (Fed. Cir. 1994), the court stated:

> Under the rule of *ejusdem generis,* where an enumeration of specific things is followed by a general word or phrase, the general word or phrase is held to refer to things of the same kind as those specified. As applicable to classification cases, *ejusdem generis* requires that the imported merchandise possess the essential characteristics or purposes that unite the articles enumerated *eo nomine* in order to be classified under the general terms.

*Sports Graphics, Inc. v. United States, 24 F.3d at 1392. See also Van Dale Indus. v. United States,* ____ F.3d ____, No. 94–1353 (Fed. Cir. March 17, 1995).

That an imported article must possess the essential characteristics or purpose is no different than saying an imported article must be substantially the same in design, construction, function, and use. Unless explicitly stated, how else does one discern the essential characteristics or purposes of enumerated articles other than by examining design, construction, function and use?

A comparison of typewriter ribbons to ISRs demonstrates that these articles are not similar. Typewriter ribbons and ISRs do not possess the same essential characteristics as they are designed and constructed differently. Typewriter ribbons are typically narrow whereas ISRs are wide, varying between 228 and 325 millimeters in width. *St. Facts* at 7. Typewriter ribbons are uniformly inked along their length. By contrast, ISRs are coated with alternating color configurations throughout their length *(i.e.,* yellow, magenta, cyan, and black), and use color marks and page marks located precisely along the edges of the ISR for continuous electronic feedback and precise electronic positioning for overprinting. *Id.* at 6, 12, 13.

Typewriter ribbons and ISRs do not possess the same purposes, as they function differently and are used differently as well, as given by other essential characteristics. With typewriter ribbons and ribbons

560

inked or otherwise prepared for giving impressions, the ink is transferred to paper by impression which occurs when the ribbon is directly impacted by a mechanical striker. The purpose of such ribbons therefore, is to serve as a medium for print on paper by impression from impact, not the general purpose of printing, as claimed by Customs. That the purpose of the articles enumerated in heading 9612 is so limited to print by impression is evidenced by the terms of that provision— as required by the rule of *ejusdem generis*. Moreover, from the above decisions it is clear that term *similar*, under the tariff laws of the United States, has come to mean more than being able to produce the same ultimate result, or serve the same general purpose, whether that purpose be dying fabrics, lighting a hallway, dispensing mustard, magnifying handiwork, carrying food, or forming an image on paper. *See, supra, Pickhardt v. Merritt,* 132 U.S. 252 (1889); *United States v. Godillot & Co.,* 3 Ct. Cust. App. 128 (1912); *Wecolite Company v. United States,* 38 Cust. Ct. 167, C.D. 1858, *aff'd,* 45 CCPA 54, C.A.D. 672 (1958); *J. E. Bernard & Co., Inc. v. United States,* 63 Cust. Ct. 390, C.D. 3924 (1969); *and Sports Graphics, Inc. v. United States,* 24 F.3d 1390 (Fed. Cir. 1994). In each of these cases the court focused on a more immediate purpose or use to determine similarity.

The purpose of ISRs is to serve as a medium for the printing of graphic images on paper by use of heat. As was stipulated to, in the thermal printing process, pigmented wax is never transferred to the paper by means of impact. *Id.* at 10. The color thermal transfer printing process is based on the subtractive color mixture process and involves the following steps: (a) the color ISR and the paper are carefully positioned together; (b) the printer's thermal heater unit heats and melts the wax pigments from the back of the base film; (c) the wax pigments are heat-fused to the paper and adhere by means of a thermally-induced mechanical bond; (d) the color ISR is advanced until the second desired color is carefully positioned next to the paper; (e) the thermal heater unit heats and melts wax pigments of the second desired color, the ISR is advanced to the third desired color, and so on until all colors have been sequentially overprinted onto the paper. *Id.* at 8. Up to seven colors can be transferred to the paper by means of the subtractive color mixture process, in which the three subtractive colors are laid sequentially upon one another. *Id.* at 9. An image is transferred to the paper when the pigmented wax on the ISR is melted by the heating elements in the printer's thermal heater unit. *Id.* at 10. The transfer is completed, and the image quality is improved, when the paper and the molten wax are pressed together by the constant pressure of the rubber platen roller and the print head. *Id.*

Given the differences in design, construction, function and use, it is clear that ISRs do not possess the essential characteristics or purposes of typewriter ribbons, *i.e.,* they are not similar. QMS having overcome its burden of demonstrating that ISRs are not typewriter or similar ribbons, the Court turns next to QMS's claimed classification.

The Court finds it unnecessary to determine whether ISRs are "parts or accessories." Assuming, *arguendo*, that ISRs are classifiable as "parts or accessories" under subheading 8473.30.40, the General Rules of Interpretation require that, where goods are, *prima facie*, classifiable under two or more headings, the heading which provides the most specific description shall be preferred to headings providing a more general description.[11] QMS's claimed classification fails because this product is more specifically provided for under subheading 3702.44, "Photographic film in rolls, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in rolls, sensitized, unexposed: Other film, without sprocket holes, of a width exceeding 105 mm: Of a width exceeding 105 mm but not exceeding 610 mm."[12]

The Court is aware that there appear to be obvious differences between ISRs and photographic film as the term "photographic" is commonly understood. However, the Court is bound by certain rules of interpretation and canons of construction in determining the intent of the legislature as expressed in tariff classifications. The General Rules of Interpretation require that an article be classified as follows:

> 1. * * * for legal purposes, classification shall be determined according to the terms of the headings and any relative section or chapter notes and, provided such headings or notes do not otherwise require, according to the following provisions * * *

Harmonized Tariff Schedule of the United States, General Rules of Interpretation, Rule 1 (1990). Additionally, the Court of Appeals for the Federal Circuit has stated the following regarding interpretation of tariff provisions:

> When a tariff term is not defined in either the HTSUS or its legislative history, the term's correct meaning is its common meaning. A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the common meaning of a tariff term. Additionally, a court may refer to the Explanatory Notes of a tariff subheading, which do not constitute controlling legislative history but nonetheless are intended to clarify the scope of HTSUS subheadings and to offer guidance in interpreting subheadings.

---

[11] Rule 3 of the General Rules of Interpretation is set out as follows:

3. When, by application of rule 2(b) or for any other reason, goods are, *prima facie*, classifiable under two or more headings, classification shall be effected as follows:
(a) The heading which provides the most specific description shall be preferred to headings providing a more general description * * *.

Harmonized Tariff Schedule of the United States, General Rules of Interpretation, Rule 3(a) (1990).

[12] The relevant tariff provision is set out as follows:

3702      Photographic film in rolls, sensitized, unexposed, of any material other than paper, paperboard or textiles; instant print film in rolls, sensitized, unexposed:

     *     *     *     *     *     *     *

Other film, without sprocket holes, of a width exceeding 105 mm:

     *     *     *     *     *     *     *

3702.44      Of a width exceeding 105 mm but not exceeding 610 mm ........................... 3.7%

Harmonized Tariff Schedules of the United States, Section VI, Chapter 37, Subheading 3702.44 (1990).

*Mita Copystar America v. United States,* 21 F.3d 1079, 1082 (Fed. Cir. 1994) (citations omitted).

In this case, the term photographic is provided for. Note 2 to Chapter 37 states:

> 2. In this chapter the word *"photographic"* relates to a process which permits the formation of visible images directly or indirectly by the action of light or other forms of radiation on sensitive surfaces.

As for individual terms within the definition, Van Nostrand's Scientific Encyclopedia defines radiation as follows:

> 1. The emission and propagation of energy *through space or through a material medium* in the form of waves; for instance, the emission and propagation of electromagnetic waves, or of sound and elastic waves.
>
> 2. The energy propagated *through space or through a material medium* as waves; for example, energy in the form of electromagnetic waves or of elastic waves. The term radiation, or radiant energy, *when left unqualified, usually refers to electromagnetic radiation;* such radiation commonly is classified, according to frequency, as radio-frequency, microwave, infrared, visible (light), ultraviolet, x-rays, and [gamma]-rays * * * (emphasis added).

Van Nostrand's Scientific Encyclopedia, at 2378 (Douglas M. Considine *et al.* eds., 7th ed. 1989). The McGraw-Hill Concise Encyclopedia of Science & Technology defines heat radiation as follows:

> The energy radiated by solids, liquids, and gases as a result of their temperature. Such radiant energy is in the form of electromagnetic waves and covers the entire electromagnetic spectrum, extending from the radio-wave portion of the spectrum through the infrared, visible, ultraviolet, x-ray, and gamma-ray portions. From most hot bodies on Earth this radiant energy lies largely in the infrared region.

The McGraw-Hill Concise Encyclopedia of Science & Technology, at 903 (Sybil P. Parker *et al.* eds., 2d ed. 1989).

From the statutory definition of "photographic," and the scientific definitions of the term radiation used in the statutory definition, this Court finds the term "photographic" to be sufficiently broad so as to indicate a legislative intent to include within the tariff provisions of Chapter 37 more processes than what may be considered conventional photography or photography as that term may be commonly understood. This Court also finds that the thermal transfer process utilized in this case to be a "photographic" process within the statute. For the purposes of the statute, it does not matter that the image is initially digitally created (or coded, or enhanced, as the case may be) and transferred to paper by a digitally, electronically and mechanically controlled radiation process; or that the sensitive surface is only sensitive to heat radiation, of a given wavelength; or that the sensitive surface is utilized at the latter part of the image-making process. It is sufficient that the process

permits the formation of visible images directly or indirectly by the action of light or other forms of radiation on sensitive surfaces. The thermal transfer process permits the formation of visible images by the action of heat radiation on a heat-sensitive surface treated with wax pigments. *St. Facts* at 10. ISRs are the "photographic film" used in that process, as they are in rolls, sensitized to heat radiation, unexposed to heat radiation, and made of a material other than paper, paperboard or textiles. *Id.* at 6, 7. Furthermore, ISRs are without sprocket holes, of a width exceeding 105 mm but not exceeding 610 mm. *Id.* at 7, *Exemplar.* Accordingly, ISRs are, *prima facie,* classifiable under subheading 3702.44. Hence, even if ISRs were, *prima facie,* classifiable under the subheading 8473.30.40 as "parts and accessories," that classification would not be appropriate as it provides a description which is less specific than the "photographic film" subheading.

## CONCLUSION

For the foregoing reasons, this Court finds that plaintiff has overcome the presumption of correctness of Customs' classification of imported ISRs under subheading 9612.10.90 of the HTSUS. This Court further finds that the imported ISRs are properly classifiable under subheading 3702.44 of the HTSUS. Judgment will be entered accordingly.